MATALKA, APPELLANT, *v.* LAGEMANN ET AL., APPELLEES.

(No. 84AP-546—Decided January 29, 1985.)

*John G. Neal,* for appellant.
*Riley, Ucker & Lavinsky* and *Timothy J. Ucker,* for appellees.

NORRIS, J. Plaintiff-appellant, George A. Matalka, appeals an order of the trial court sustaining defendants-appellees' motion to dismiss his lawsuit. Plaintiff's complaint alleged that defendants, a weekly Gahanna newspaper and its editor, had libeled him by publishing editorials and cartoons.

Plaintiff was chairman of the committee seeking the recall of the Mayor of Gahanna, and it is apparent from the publications that the defendants were opposed to the recall effort. It is also apparent from the case file that those favoring recall had indicated to Gahanna's city council the willingness of the

group to pay the extra cost that would be incurred by the city if it were to opt for a special election, as opposed to waiting and submitting the question to the electorate at the general election.

Excerpts from the first editorial, printed under the headline "Selling of a Vote," follow:

"There is something obscene about a group or individual trying to buy an election date from the city council. But that is what one individual indicated he was going to try to do.

"It is repugnant to the orderly governing of the city, and to its image, that some people believe that such decisions might be up for bid, or that city council members would be influenced by payment.

"Exchanging money for goods, services for favorable decisions is buying and selling. In effect, this offer is a bribe.

"If one group wants an early election and bids $7,000, what bid should another group make for a later election date? Would the higher bidder win?

"If the city sets a precedent of selling decisions — for whatever purpose — it is not difficult to see where it could lead. * * *

"* * *

"The election date should have been set on the merits of the situation and not on funding. If council had decided an earlier date were merited, the city could have found sufficient funds to hold it on an earlier date.

"But there were not then, nor are there now, any overriding factors to set an early election date.

"Voters should have sufficient time to make up their minds in an orderly, rational manner. All of us should be especially skeptical of those who want to hasten the process and particularly of any group which would propose to buy haste."

This editorial was accompanied by a cartoon depicting the city council in session, with the presiding officer conduc-

ting an auction in which the highest bidders obtained favorable decisions from the council. The presiding officer is portrayed as auctioning several decisions, and as saying, relative to the recall election issue:

"OK, folks, Gahanna City Council is ready to accept bids. First item, recall elections date. [W]e've got $7,500 bid, any other offers? I got sevenfive sevenfive sevenfive going gone. Sold to the man in the white shoes for $7,500. * * *"

The second editorial is reproduced below, in full:

"The offer to pay the city $7,500 to schedule an earlier election date, and the indication some of the council members would be willing to go along with it, reminds us of a story. A prostitute was before the judge for taking money for certain favors from a client.

" 'I don't see anything wrong with it, your honor,' she said. 'I wanted to do it anyway.'

"We definitely separate those who are free from those who charge. We might not condone the free, but we make charging illegal.

"Council was required to set a date. To discuss changing the date in return for money puts the council and the recall committee in another category. The fact that some council members might want to do it anyway does not mitigate the situation."

This editorial was also accompanied by a cartoon. In it, a lady intended by the artist to represent a prostitute, and labeled "City Council," is depicted talking to a man labeled "Recall Committee." In her voice balloon are the words, "Don't get me wrong, I'm not that kind of girl. I enjoy it. Let's see your money," and in his, "Well hi there. I've got some bucks."

Filed along with defendants' motion to dismiss were stipulations entered into by the parties with a view to narrowing the questions before the trial court.

Plaintiff raises two assignments of error which are interrelated:

"1. The trial court erred in that the evidence must be construed most strongly in favor of the appellant.

"2. The trial court erred in finding, as a matter of law, that no liability for libel can be imposed upon the appellees in this case."

Although the Constitution protects and preserves the right to a free press, the exercise of that right is subject to the condition that, if the publisher negligently publishes defamatory statements about a private individual, the publisher is liable for damages. *Embers Supper Club, Inc.* v. *Scripps-Howard Broadcasting Co.* (1984), 9 Ohio St. 3d 22. Freedom of the press does not grant to a publisher the right to defame another.

Defamation is a false publication causing injury to a person's reputation, or exposing him to public hatred, contempt, ridicule, shame or disgrace, or affecting him adversely in his trade or business. *Cleveland Leader Printing Co.* v. *Nethersole* (1911), 84 Ohio St. 118; *Newbraugh* v. *Curry* (1831), Wright 47.

As the result of the stipulations, the trial court was required to address only the single issue of whether the materials published by defendants were defamatory. Whether a publication is defamatory on its face (defamatory *per se*), or, if not, whether a publication is capable of being interpreted as defamatory (defamatory *per quod*), are questions of law for the trial court. See *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323; *Thomas H. Maloney & Sons, Inc.* v. *E. W. Scripps Co.* (1974), 43 Ohio App. 2d 105 [72 O.O.2d 313].

Plaintiff contends that the effect of the publications was that defendants accused him of criminal conduct: bribing city council, and soliciting a prostitute. Central to our inquiry is a determination of whether, viewing each publication as a whole, a person reading the materials could reasonably conclude that defendants had inferred that plaintiff had committed a crime.

Of material assistance here is the United States Supreme Court's opinion in *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler* (1970), 398 U.S. 6.

In *Bresler,* the plaintiff was a local real estate developer and builder who was seeking zoning variances from the Greenbelt City Council in order to construct high-density housing. At the same time, the city was attempting to acquire from plaintiff a different tract of land for the construction of a high school. The concurrent negotiations obviously provided both parties considerable bargaining leverage and evoked substantial controversy within the community. Several tumultuous city council meetings were held, at which many citizens freely expressed their views, some characterizing plaintiff's negotiating position as "blackmail." The defendant newspaper reported the meetings, including the characterizations, printing the word "blackmail" several times.

In his opinion, Justice Stewart noted that, under these circumstances, use of the word "blackmail" was not slander when spoken, nor libel when reported by the newspaper. He then continued with the following language at 13-14:

"There can be no question that the public debates at the sessions of the city council regarding Bresler's negotiations with the city were a subject of substantial concern to all who lived in the community. The debates themselves were heated, as debates about controversial issues usually are. During the course of the arguments Bresler's opponents characterized the position he had taken in his negotiations with the city officials as 'blackmail.' * * *

"It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and

wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime."

We conclude that a similar situation prevailed here. In retrospect, the materials must, of necessity, appear even to defendants as more than a little foolish. And, it is precisely because of their frantic and shrill nature that no one viewing the materials could reasonably conclude that plaintiff had bribed the city council or solicited a prostitute. Instead, a reasonable person could only conclude from the language used in the first editorial and cartoon that, while defendants grossly exaggerated the import of plaintiff's conduct, nevertheless, all that plaintiff had done was to offer to underwrite the cost of a special election in an effort to persuade the city council not to make a decision to wait until the general election to submit the recall, based solely on avoiding the cost of a special election. In the context of the community's heated debate over the recall effort, the term "bribe" could only be viewed as "no more than rhetorical hyperbole, a vigorous epithet" used by defendants, who considered plaintiff's position extremely unreasonable. No reader could have reasonably believed that defendants were charging plaintiff with a criminal offense. Rather, the word was being used in its vernacular, non-legal sense — that of offering something to another to influence his conduct, as a parent might offer candy to a small child in order to induce him to go to bed. Likewise, the strained, crude analogy sought to be drawn by the second editorial and cartoon could not be taken seriously in a literal sense since it would be manifestly clear to any reasonable observer that plaintiff's conduct was in no way similar to that of a person guilty of the crime of soliciting a prostitute. Accordingly, while defendants' conduct may have been ill-advised and even irresponsible, it was not actionable.

Although it may be regrettable that defendants became emotionally involved in a local issue to the extent that they were moved to print patent absurdities, the law of defamation is not designed or permitted to penalize those who merely speak foolishly and without moderation. The framers of the United States Constitution well understood that, if a free press were to be guaranteed, the expression of silly or even sinister-sounding views would have to be tolerated. This risk they accepted, trusting in the good sense of the people to weed out, upon deliberate reflection, the foolish from the factual.

Accordingly, since it appeared beyond doubt that plaintiff could prove no set of facts entitling him to recover, the trial court properly sustained the motion to dismiss. The assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

STRAUSBAUGH and REILLY, JJ., concur.