JOURNAL ENTRY AND OPINION
Plaintiff-appellant Sue Zakaib appeals from the trial court's decision granting the motion for summary judgment filed by the defendants-appellees the City of Cleveland, former Cleveland Chief of Police Rocco Pollutro, Lisa Thomas, Commissioner of the Division of Building and Housing for Cleveland, and the following inspectors for the building and housing division: Kevin Franklin, Rick Soeder, Michael Smyczek, Larry Skule, Ricardo Phillips, and Frank Koscho. The appellant's amended complaint asserted causes for defamation, intentional infliction of emotional distress, and a cause of action under 42 U.S.C. § 1983
for deprivation of due process. The causes of action asserted by the appellant arose out of a search warrant executed by the Cleveland Police Department which led to an administrative search warrant executed by the Cleveland Building and Housing Department. This latter search warrant resulted in the immediate condemnation of the building.
The appellant is the owner of a building located at 11108 Primrose Avenue, Cleveland, Ohio. The building contains a convenient store called Dagwood's Deli and an upstairs apartment. The building is managed by the appellant's son, George Zakaib. Mrs. Zakaib, a Florida resident, has seen the store only once. The appellees assert in the motion for summary judgment that the store is owned by A.L. Corp., a corporation held by Richard Corey, Mrs. Zakaib's nephew. Attached to the motion for summary judgment are affidavits from several of the appellees, the notices of violations from the Building and Housing Department, the transcripts of the hearings before the Board of Building Standards and Building Appeals (BBS), invoices from repairs made to the premises in question, and a letter from former Police Chief Pollutro to Mrs. Zakaib.
The motion for summary judgment also has attached as an exhibit the affidavit of Detective Eugene Jones of the Cleveland Police Department. Detective Jones affirmed that he has training and experience in the detection, recognition, packaging, and selling of controlled substances and dangerous drugs along with their methods of production and distribution. As a result of neighborhood and council manic complaints, a surveillance of 11108 Primrose Avenue was conducted. The details of the investigation are contained in Detective Jones' affidavit attached to the search warrant. Detective Jones affirmed that he pursued a search warrant after properly developing probable cause that drugs or stolen computers would be found on the premises. The search warrant was executed on the Primrose Avenue address in conjunction with a search, pursuant to a search warrant, of a dwelling at 1103 East 111th Street, Cleveland, Ohio.
The affidavit attached to the warrant states that Detective Jones received citizens and councilmanic complaints of drug sales occurring from the premises. A Confidential Informant informed Officer Jones that drug sales were occurring from the premises and agreed to assist the police by making a controlled purchase. The affidavit describes the steps taken to ensure that the purchase was not tainted. Detective Jones observed the informant enter the premises and then exit with an unknown black male. The two went to a nearby residential dwelling located at 1103 East 111th St., Cleveland. Upon arrival at that location, the unknown black male entered the dwelling, stayed for two minutes, and returned to the informant. The unknown male exchanged two plastic bags containing green leafy substance for currency from the informant. The unknown male returned to the Primrose Avenue address. The substance obtained by the informant was later identified as marijuana by the Cleveland Police Scientific Investigation Unit.
The affidavit attached to the search warrant was also signed by Detective James Butler. Officer Butler affirmed that from October 1997 through March 1998, the police received complaints from the Cleveland Board of Education regarding theft of its computers from various locations throughout the Sixth District. Upon investigation, the schools appeared to have been burglarized. During this same time frame, the department received a complaint from Jimmy Malek, owner of Dagwood's, that a former employee, Charles Coleman, committed a theft offense at Dagwood's. Coleman later agreed to provide the police with a written statement regarding the illegal activities at Dagwood's involving the receipt of stolen computers. Coleman stated that Jimmy Malek took possession of computers marked B.O.E., an abbreviation used by the Cleveland Board of Education to identify its possessions. Coleman observed Jimmy Malek obtain 10 to 15 computers from two black males, pay the men $250 per computer, and store the computers until they were resold. The police were able to obtain a statement from one Henry Ferguson who admitted to stealing computers from various city schools. Ferguson then sold the computers to Jimmy at Dagwood's. Ferguson stated that Jimmy paid him $850 for computers stolen from the schools.
On April 24, 1998, a judge on the bench of the Cuyahoga County Common Pleas Court issued a search warrant for 11108 Primrose Avenue, Cleveland. The police executed the search warrant the same day. Sargent Frank Bova affirmed that surveillance was conducted on the property prior to the search warrant being issued. The search did not unearth any drugs or stolen computers, the object of the search, however Sargent Bova completed a Cleveland Drug House Task Force (DHTF) abatement checklist on the premises. This form indicated that there was rubbish and debris in the yard area, that there was structural damage to the foundation and roof, that there were combustible materials in the basement, bare/exposed electrical wires in the basement, an excessive use of extension cords in the basement, and that smoke detectors were missing. The second page of the form indicates that there was an arrest made at the time the police search warrant was executed.
Sargent Bova testified in his deposition that it is his obligation as a city servant to pass along to the building and housing department any information regarding code violations that he observes when conducting criminal searches. He noted that he is not the expert, and that at times the building and housing inspectors agree with him and that at times they do not.
On May 6, 1998, the Cleveland Municipal Court issued a search warrant which authorized the Division of Building and Housing, Demolition Bureau, and the Cleveland Police Department to conduct a search of the premises for violations of the Codified Ordinances of the City of Cleveland and for conditions which are, or may become, hazardous to the general public. Pursuant to this search warrant, the DHTF conducted an administrative search which resulted in the condemnation of the building and its immediate evacuation. The record contains three Notices of Violations of Housing Ordinances which outline deficiencies in the plumbing, the structure of the building, HVAC and electrical systems. These notices also indicate that there is an accumulation of combustibles, metal parts and debris. The separate Notice of Electrical Violations is three pages long and the Notice of Violation of HVAC 
Refrigeration Ordinances is four pages long.
Mr. Frank Koscho, the Chief Building Inspector for the city, affirmed that he supervised the DHTF inspection of the property. During the inspection, Notices of Violations were issued by various inspectors which indicated that these deficiencies, taken as a whole, presented a hazard to human life, especially in light of the fact that a grocery store was operated on the premises. Mr. Koscho affirmed that the East Ohio Gas representative determined that there was a gas leak and that this gas leak combined with the electrical violations created a hazard of fire and explosion. Mr. Koscho affirmed that the pitch of the flues for carbon monoxide venting in the basement also created a hazard to life and that there was raw sewage in the basement. Mr. Koscho affirmed that due to the above-stated violations, along with others, he determined that condemnation was immediately necessary and appropriate. He also noted that he was aware that children lived in the upstairs apartment.
Michael Smyczek affirmed that he has obtained his State certification for electrical safety inspection and that during his inspection of this premises he found dangerous use of extension cords to power ungrounded large pop coolers. The extension cords were running adjacent to the free-standing furnace found to have a natural gas leak. He found that the wiring in the upstairs apartment showed signs of an electrical fire at a wall outlet, there were open electrical junction boxes and loose wire connections with electrical tape instead of wire nuts, Romex wiring was used in a commercial building, and the electrical light fixtures in the upstairs apartment were unsecured and hanging.
Mr. Larry Skule affirmed that he inspected the plumbing and found the following hazards: the main sewer was plugged causing raw sewage to leak directly into the basement where food products are stored, the toilet in the store bathroom was not secured to the floor, the lavatory waste drain was not sealed on the main floor of the store, the lavatory was not vented and the sump pump fittings were taped with packing/scotch tape, the drain system for the coolers was not properly installed, there was sewage seeping up through floor of the basement near the chimney, water lines were held in place with packing/scotch tape, and the flue connected to the gas hot water tank was pitched downward which will result in carbon monoxide being pumped into the basement and the entire premises.
Rich Soeder, the HVAC/mechanical code inspector, affirmed that he found open, unsealed and improperly pitched flues for carbon monoxide venting, a natural gas line leak, open and exposed wiring and safety controls for the furnaces, the gas curb box had been covered by cement when the driveway was poured which would prevent outside gas shut off in the event of an emergency, gas lines had been improperly installed, the outside air conditioning unit was installed without covers on the electrical components, and that the furnaces were installed without permits and had never been inspected.
Inspector Kevin Franklin found rotten floor joists beneath high weight fixtures on the floor of the store, a completely open and exposed stairwell pit in the rear of the premises, a garage full of debris which was structurally unsound creating the potential for collapse, and the toilet was not secured to the floor and the floor around the toilet was rotten. Mr. Franklin affirmed that he personally recorded the video attached to his affidavit and that the video is of his inspection.
Inspector Ricardo Phillips affirmed that he is employed by the health department and that he has obtained certification from the State Registered Sanitation Board. During his inspection of the premises he found that the interior of the microwave was unsanitary; uncovered frozen cookies in freezer; straws, napkins, and syrup in the restroom; infestation of mice and roaches; outdated food products and dented and rusted cans offered for sale to the public; pop, juice and beer stored on the floor; food products stored in the basement; junk and debris piled in the back of the store and basement that allows places for rodent harborage; animal waste and food in the back that would lead to rodent infestation; and dirty shelves, dirty food packages, dirty equipment and infrastructure, including rodent droppings.
The appellant appealed her housing violations to the BBS. The first hearing was continued because all of the violations had not been appealed. At the second hearing, the appellant's counsel indicated that he had instructed his client not to repair the violations so that the trial court could observe the premises in its current condition. At the hearings, the basis of the appellant's argument was that some of the violations do not exist and that the property should not have been condemned. Additionally, the appellant argued that the violations which did exist on the premises were not severe enough to condemn the property. The appellant's request to continue the hearing until his contractors could be present to testify was denied. During the hearing, the board viewed the videotape of Kevin Franklin and heard testimony from Mr. Franklin, Mr. Soeder, and Mr. Smyczak. The board concluded that enough of the violations did exist and that they were hazardous.
The Board ultimately remanded the matter to the Division of Building and Housing for further action, with the provision that the appellant be directed as to which violations constitute the hazards that are severe enough to keep the building closed. The Board noted that as soon as the severe hazards were abated, the property could be reopened so that the remaining violations could be abated.
The appellant sets forth three assignments of error, the first and second of which will be considered together.
The first assignment of error:
 THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE DEFENDANTS ON PLAINTIFF'S DUE PROCESS CLAIM.
The second assignment of error:
 THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON APPELLANT'S FOURTH AMENDMENT SEARCH AND SEIZURE CLAIM.
The appellant argues that the City of Cleveland and the other appellees, acting under color of law and pursuant to ordinances and policies of the City of Cleveland, deprived the appellant of her due process rights and violated her right to be free from unlawful searches and seizures. The appellant asserts that: 1) her property was forfeited prior to any due process hearing; 2) the original search warrant was not supported by probable cause; 3) any evidence resulting from the execution of the warrant is tainted; 4) the administrative search which lead to the boarding up of the property was the result of the illegal search; and, 5) that under the city's drug house board-up policy the results are a foregone conclusion and the property was destined to be boarded up as an immediate hazard. The appellant asserts that there is a genuine issue of fact as to whether the post-deprivation proceeding is adequate, as to whether there was an emergency in this specific situation which required an immediate board-up, and as to whether or not using a criminal search to gather evidence of building code violations is proper.
Appellate review of summary judgments is de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102; Zemcik v. La Pine Truck Sales 
Equipment (1998), 124 Ohio App.3d 581. The Ohio Supreme Court recently restated the appropriate test in Zivich v. Mentor Soccer Club (1998),82 Ohio St.3d 367, 369-70, as follows:
 Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor.
 Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.
 Dresher v. Burt (1996), 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, 273-274.
Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). Mootispaw v. Eckstein (1996), 76 Ohio St.3d 383. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356.
In Mitch ell v. City of Cleveland (6th Cir. Ohio Dec. 17, 1998), No. 97-4206, unreported, 1998 U.S. App. Lexis 31768, the court considered a remarkably similar case. The court held that to establish a cause of action under S 1983, a plaintiff must show (1) a person acting under color of state law (2) deprived her of a right secured by the Constitution or other federal laws. See, e.g., Doe v. Wigginton,21 F.3d 733, 738 (6th Cir. 1994).
This court begins the analysis in this case by noting that in State v. Moore (2000), 90 Ohio St.3d 47, the Supreme Court has recently held:
 The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 14, Article I of the Ohio Constitution, nearly identical to its federal counterpart, likewise prohibits unreasonable searches. State v. Kinney (1998), 83 Ohio St.3d 85, 87, 698 N.E.2d 49, 51.
 For a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant. Katz v. United States (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed. 2d 576, 585; State v. Brown (1992), 63 Ohio St.3d 349, 350, 588 N.E.2d 113, 114. This requires a two-step analysis. First, there must be probable cause. If probable cause exists, then a search warrant must be obtained unless an exception to the warrant requirement applies. If the state fails to satisfy either step, the evidence seized in the unreasonable search must be suppressed. Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; AL Post 763 v. Ohio Liquor Control Comm. (1998), 82 Ohio St.3d 108, 111, 694 N.E.2d 905, 908.
The appellant in the case sub judice makes a bald assertion that the search warrant was not supported by probable cause, but has failed to introduce any evidence to support this argument. The search warrant was properly supported by an affidavit from two experienced officers who set forth their respective efforts to investigate illegal activity allegedly occurring at the appellant's premises. The affidavit contains information regarding the police investigation sufficient for a judge to have found probable cause. The failure to find the items sought in the search warrant during the search does not require a finding that the search warrant was without probable cause. Thus, this court concludes that the search warrant was in order and that the resulting evidence was not tainted.
Next, this court considers the appellant's remaining arguments regarding deprivation of due process. As stated supra, the Sixth Circuit in Mitchell considered issues similar to those presented in the case now before this court. Mitchell's rented home was searched by the Cleveland Police for drugs. The preprinted form used by Officer Bova here was used in Mitchell's home as well. This abatement form indicated that there were housing code violations. The resulting DHTF search resulted in an immediate evacuation and boarding up of the residence. In reviewing Mitchell's due process claims, the court held:
 Mitchell alleges that she should have been afforded notice and an opportunity to be heard before being ordered to vacate her residence. n4 It is well-established that due process generally requires notice and a hearing prior to eviction. See, e.g., Fuentes v. Shevin, 407 U.S. 67, 32 L.Ed.2d 556, 92 S. Ct. 1983 (1972). The Supreme Court has recognized, however, that "extraordinary situations," id. at 82, may justify postponement of such a hearing until after eviction. "A prior hearing is not constitutionally required where there is a special need for very prompt action to secure an important public interest and where a governmental official is responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance." Flatford v. City of Monroe, 17 F.3d 162, 167 (6th Cir. 1994) (citing Fuentes, 407 U.S. at 91). See also Hodel v. Virginia Surface Mining Reclamation Ass'n, 452 U.S. 264, 69 L.Ed.2d 1, 101 S.Ct. 2352 (1981) (rejecting procedural due process challenge to emergency procedures which allowed government inspectors to order the cessation of mining operations when an inspector perceived immediate danger to public safety). (Footnote omitted.)
This court finds itself in agreement with the logic used by the court in Mitchell. The resulting inspection for building code violations revealed many and varied hazards, some immediate, some not. The serious hazards, such as the incorrect pitch of the flue, the raw sewage in the basement where food was stored, and the electrical violations, as well as the gas leak, were sufficient to warrant the immediate evacuation and closure of the premises. The appellant's assertion that she was denied her due process rights to a pre-condemnation hearing fail.
In Mitchell, as here, the plaintiff argues that the city's policies made it a foregone conclusion that any home searched by the police would ultimately be condemned based on housing violations. The Mitchell Court held:
 Finally, regardless of whether the city was motivated to investigate serious code violations in the case of houses where police conducted drug-related searches, the unrefuted evidence of the code violations justified the order to vacate in this case. Cf. Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed. 2d 89 (1996) (reasonableness of traffic stops for Fourth Amendment analysis does not depend on actual motivations of officers involved).
As stated supra, the code violations in the Primrose Avenue premises were sufficient and serious enough to justify the order to condemn the property in this particular case.
The appellant also contests the post-deprivation due process at the hearings was inadequate. However, the record reveals that at the first hearing only the electrical violations had been appealed. The BBS continued the hearing so that all of the violations might be heard at the same time. At the second hearing, the appellant failed to present witnesses to support her arguments. The appellant was provided with post-deprivation due process, but failed to place any evidence in the record to support her arguments.
The appellant failed to set forth any issue of material fact and the trial court did not err in granting the appellees' motion for summary judgment on the issue of due process and on the issue of the validity of the searches.
The appellant's first and second assignments of error are overruled.
The third assignment of error:
 THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON APPELLANT'S DEFAMATION CLAIM.
In this assignment of error, the appellant asserts that she was defamed when the DHTF prominently placed the words drug free on the boards used to board up her property. The appellant contends that the clear implication of these words was that the business had been involved in drugs and because the city had closed the business, the property was now drug free. The appellant asserts that this false implication that she was involved in drugs caused harm to her reputation in the community.
In A B-Abel Elevator Co., Inc. v. Columbus (1995), 73 Ohio St.3d 1, the Supreme Court defined libel as:
 In Ohio, "libel" is defined generally as a false written publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession. Becker v. Toulmin (1956), 165 Ohio St. 549, 553, 60 O.O. 502, 504, 138 N.E.2d 391, 395; Cleveland Leader Printing Co. v. Nethersole (1911), 84 Ohio St. 118, 95 N.E. 735, paragraph two of the syllabus. See Matalka v. Lagemann (1985), 21 Ohio App.3d 134, 136, 21 OBR 143, 145, 486 N.E.2d 1220, 1222 (defamation); Hersch v. E.W. Scripps Co. (1981), 3 Ohio App.3d 367, 374, 3 OBR 430, 438, 445 N.E.2d 670, 678; Thomas H. Maloney Sons, Inc. v. E.W. Scripps Co. (1974), [**1290] 43 Ohio App.2d 105, 107, 72 O.O.2d 313, 315, 334 N.E.2d 494, 497. (Footnote omitted.)
While, as the appellees point out, the appellant has forcefully argued that the property was, in fact, drug free, such that the first element of libel is not met — there being no false statement — this court takes seriously the appellant's statement that although the statement made by the appellees was in fact true, by implication, the public could be lead to believe that the appellant had been involved in the drug trade.
In McKimm v. Ohio Elections Commn. (2000), 89 Ohio St.3d 139, the court reiterated that Ohio has adopted the innocent-construction rule. The rule states that if allegedly defamatory words are susceptible [of] two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 372. The rule protects only those statements that are reasonably susceptible of an innocent construction because to construe a publication in an unreasonable manner in order to give it an innocent interpretation is itself incompatible with the rule's requirement that words be given their natural and obvious meaning. Id.
Here, the implied defamatory nature of the statement drug free should be rejected and the innocent meaning adopted. It is reasonable that the words could be construed as a mere statement that the property has been found to be drug free.
The appellant's third assignment of error is overruled.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
 ___________________ SWEENEY, J.
DIANE KARPINSKI, A.J., and COLLEEN CONWAY COONEY, J., CONCUR.