[Cite as *Sabino v. WOIO, L.L.C.*, 2016-Ohio-491.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 102571**

---

## GEORGE SABINO, III

PLAINTIFF-APPELLANT

vs.

## WOIO, L.L.C., ET AL.

DEFENDANTS-APPELLEES

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-801778

**BEFORE:** Jones, A.J., Celebrezze, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** February 11, 2016

**ATTORNEYS FOR APPELLANT**

John A. Huettner
19425 Van Aken Boulevard, Suite 314
Shaker Hts., Ohio 44122

Michael R. Blumenthal
David B. Waxman
Waxman Blumenthal L.L.C.
28601 Chagrin Boulevard, Suite 500
Cleveland, Ohio 44122


**ATTORNEYS FOR APPELLEES**

Michael K. Farrell
Melissa D. Bertke
Baker & Hostetler, L.L.P.
PNC Center
3200 National City Center
1900 East 9th Street
Cleveland, Ohio 44114

Stephen J. Rosenfeld
Mandell, Menkes, L.C.
One North Franklin Street, Suite 3600
Chicago, Illinois 60606

LARRY A. JONES, SR., A.J.:

**{¶1}** Plaintiff-appellant, Georgio Sabino, III, appeals the trial court's decision to grant a directed verdict in favor of defendants-appellees, WOIO, L.L.C. and news reporter Ed Gallek (at times collectively referred to as "WOIO"). We affirm.

## I. Procedural History and Facts

**{¶2}** In 2011, Sabino was a first-year art teacher at Cleveland Heights High School. He was not yet a licensed full-time teacher at the time he was teaching, and never became one while he taught in Cleveland Heights. Sabino had two laptop computers at the school, one personal and one belonging to the school. He allowed his students access to both computers.

**{¶3}** In December 2011, two students reported to another teacher that they saw inappropriate images on Sabino's personal computer. "Student 1" reported that she saw a file named "teen" and opened it, because she thought it was a file that housed pictures pertinent to their class. When Student 1 opened the file, she alleged that she saw a video of a young male and female having sex and estimated the age of the participants in the video to be 14 to 15 years old. "Student 2" alleged she saw links to a pornographic website on Sabino's computer.

**{¶4}** The next day, police and school officials removed Sabino from his class and seized both laptop computers. Sabino described this removal as "very traumatic," "extremely public," and "humiliating." Sabino was placed on paid leave and was never asked back to teach in the district.

**{¶5}** The same day Sabino was removed from his classroom, television station WOIO, also known as Channel 19, posted an article on its website reporting that a Cleveland Heights High School teacher was being investigated for inappropriate material on his computer. Sabino felt "embarrassed and humiliated" by the story. The initial article, published December 14, 2011, named Sabino as the teacher under investigation. His name was subsequently removed from the article.

**{¶6}** The article as amended read as follows:

**Teacher under investigation for inappropriate computer material**

Posted: Dec. 14, 2011 4:48 PM EST
Updated:　Dec. 16, 2011 5:40 PM EST

CLEVELAND HEIGHTS, OH (WOIO) - A Cleveland Heights High School teacher is now on leave pending a criminal investigation.

Cleveland Heights High School, along with Cleveland Heights School District and University Heights School District and Cleveland Heights Police are investigating inappropriate material found on the teacher's personal computer.

The teacher was placed on leave Wednesday Dec. 14, 2011.

The current school year was the art teacher's first year at Cleveland Heights High School. All background, employment and reference checks prior to employment came back clean according to the Superintendent's office.

The Cleveland Heights-University Heights School District is taking the appropriate precautions to safeguard students and will proceed with Board policies when the facts become known.

**{¶7}** In February 2012, WOIO news reporter Ed Gallek ("Gallek") followed up on the story. He obtained copies of search warrant documents and contacted Sabino's

attorney, the Cuyahoga County Prosecutor's Office, and the school district. Gallek prepared a 74-second broadcast, which was aired during the February 20, 2012 evening newscast.

{¶8} The main news anchors spoke the lead-in to the story. The first anchor stated, "And new tonight, we are uncovering new details about the investigation into a high school art teacher." The second anchor said, "He is suspected of having child pornography on his personal computer. Only Ed Gallek is investigating this case, and what his students may have seen." Gallek then appeared, sitting at a desk in the newsroom, and reported:

> We're finding out how this all started. A couple of students borrowed a teacher's laptop. What they say they saw made them wonder, are they learning from a pervert? One student says she borrowed the teacher's laptop to look at pictures of the team or the class, came across a file named "teen," teens having sex. Talking about an art teacher at Cleveland Heights High. Another student says she used the teacher's computer, saw an "interactive porno website." Again on that computer, she says it gave her a shortcut to a porno address. Another teacher heard the kids talking, they described it for the principal, cops got involved.

> This happened in December, the inside story coming to light now in court records recently filed. Records show computer crime investigators took two computers. No charges yet, so we're not naming the teacher. He did get suspended. I spoke with his attorney, everyone's still waiting for findings. An investigation into unexpected sex ed. Ed Gallek, 19 Action News.

{¶9} During the majority of the time Gallek was speaking, a stationary banner appeared on the screen. The stationary banner consisted of three lines. The top line

read "19 Investigation" in red letters highlighted in white. The second line, underneath "19 Investigation," read "Teacher Under Fire" in larger white letters highlighted in black. The third line, under "Teacher Under Fire," appeared in smaller black letters highlighted in white. The third line read "Child Porn Found on Laptop." The 19 Action News Logo appeared on the bottom right of the screen. Another banner, or ticker, with the day's headlines was scrolling across the bottom of the newscast.

{¶10} The stationary banner appeared for approximately 43 seconds during Gallek's broadcast. Gallek testified that he played no role in drafting, approving, or editing the banner and did not know about the banner until well after the broadcast.

{¶11} In February 2013, Sabino filed a complaint against Gallek and WOIO, alleging the following: Count 1, defamation — initial WOIO publication; Count 2, defamation — WOIO republication; Count 3, defamation per se — initial WOIO publication; Count 4, defamation per se — WOIO republication; Count 5, negligence; Count 6, false light invasion of privacy; and Count 7, intentional infliction of emotional distress.

{¶12} The defendants moved for summary judgment, which the trial court denied. Prior to trial, the court dismissed Counts 1, 3, 5, and 7 of the complaint, journalizing an entry that explained that Sabino "elected not to go to trial" on Counts 1, 3, 5, and 7 and "all parties agree with the court that the case will proceed to trial on Counts 2, 4, and 6." Thus, the matter proceeded to trial on Sabino's defamation and defamation per se claims with regard to the February 2012 broadcast and his false light invasion of privacy claim.

{¶13} The following pertinent evidence was presented at trial.

{¶14} Joseph Nohra ("Nohra") testified that he was a principal at Cleveland Heights High School in 2011 when the incident occurred. Nohra was on the interview committee that hired Sabino and remembered that Sabino came highly recommended; Nohra thought Sabino was the best candidate for the position even though Sabino was not yet a fully licensed teacher. Nohra testified that if Sabino passed his licensure test and was "cleared of all charges" in connection with the case, he would have no qualms recommending Sabino as an art teacher. Nohra did admit, however, that he would not want someone teaching in his school that gave porn to students.

{¶15} Professor Tim Shuckerow ("Professor Shuckerow") of Case Western Reserve University testified that Sabino was one of his former graduate students. Professor Shuckerow described Sabino as a patient, polite, and sensitive student who was enthusiastic about teaching, had a strong reputation, and had a history of volunteer work. Professor Shuckerow testified that he first became aware of the allegations against Sabino when one of his former students and a Cleveland Heights High School teacher contacted him. According to Shuckerow, he received three to four additional calls from people asking his opinion on the allegations.

{¶16} Shuckerow opined that the February 20, 2012 broadcast would have negatively affected Sabino's "ability to become employed as a teacher." But Shuckerow admitted that no one ever told him they would not hire Sabino nor was he aware of any employer that did not hire Sabino based on the news story.

{¶17} W. Scott Ramsey ("Ramsey") testified that he was Sabino's attorney when Sabino was initially investigated. Ramsey testified that Sabino was never arrested or charged with any crime in relation to the allegations that he had child pornography on his computer.

{¶18} Rachel Truitt ("Truitt") testified that she and Sabino were close family friends. She testified that Sabino was a good teacher, excellent with children, an excellent artist, very spiritual, and had good morals. Truitt testified that after Sabino was accused, mutual friends approached her and accused Sabino of being a pedophile, saying it "was in the news." Truitt did not know where the mutual friends got their information from. Truitt was of the opinion that Sabino's reputation had been damaged by the allegations against him.

{¶19} Truitt testified that she learned of the allegations when her daughter came home crying from school and told her about Sabino. Truitt then saw the broadcast on television and felt it to be untrue: "It was a news broadcast by Ed Gallek, and just the way that he said what he said about the teacher at Cleveland Heights being investigated for this."

{¶20} Amanda Duffy ("Duffy") testified that she was Sabino's girlfriend and they lived together. She admitted to viewing pornographic websites on Sabino's laptop computer but had never seen child pornography or other pornographic videos or photos on Sabino's hard drive. Duffy testified that she overheard three women talking negatively about Sabino at a restaurant shortly after the February 2012 broadcast, but she could not

confirm that the women heard about the allegations from that newscast.   Duffy felt that Sabino changed for the worse after the allegations and he had a difficult time finding employment after he was placed on leave from the high school.

{¶21} Jeffrey Firestone, who was qualified during trial as an expert in accounting, testified that Sabino's projected economic damages were $1.4 million based on WOIO's broadcast and on Sabino becoming a full-time licensed teacher.

{¶22} Robin Smith ("Smith") testified that she knew Sabino well and Sabino had been the talent manager for her children.   Smith first heard about the allegations against Sabino when a friend contacted her in December 2011.   She did a Google search on Sabino and found out that people on the internet were accusing him of being a "pervert." She thought the allegations damaged his reputation in the community.   On her way to an event in February 2012, Smith remembers someone calling her and telling her to turn on the news because there was a story about Sabino on it.

{¶23} Sabino testified that he graduated from Case Western Reserve University with a dual masters degree despite having a learning disability.   He was hired to teach art and photography at Cleveland Heights High School in 2011.   At the time of trial, Sabino was licensed as a substitute teacher.   Sabino explained that he used, and "regrettably" allowed his students to use, his personal laptop computer at school because the school's laptops were outdated or broken.   According to Sabino, a student would not be able to access any website on his personal computer that the school had blocked, such as pornography websites.   Sabino denied having a folder on his computer titled "teen" and

denied allowing students unfettered access to his computer.

{¶24} Sabino admitted there were naked and sexually explicit pictures and videos of a former girlfriend on his computer at the time the students' allegations came to light, but insisted that the pictures would be very difficult to find because it would take "15 to 20 clicks" of a mouse to access them. On cross-examination, however, he admitted that the videos and images were on a folder located on the desktop of his computer and it would only take "one to two clicks" to access them. The folder was also titled "Fashion Photography," which was one of the subjects he taught at the high school.

{¶25} Sabino denied ever filming or photographing pornography but admitted he and his girlfriend watched pornography on his laptop computer. Sabino denied saving any of the files he viewed. Sabino denied having any child pornography on his computer and testified he was cleared of any wrongdoing in relation to the students' allegations.

{¶26} Sabino testified that after the newscast someone at a restaurant called him a child molester, but he conceded that he had no knowledge whether that person got his information from the February 20, 2012 broadcast.

{¶27} Gallek testified and denied saying anything during his broadcast that would cast Sabino in a guilty light. He further denied creating any of the banners that ran during the broadcast. He explained that producers create the story banners and he did not know who created the banner for this particular story. Gallek felt he did not say anything during his broadcast that was misleading. He also testified that he could not say if he would have personally chosen different language for the banner, other than "Child Porn

Found on Computer," because it was not his job to write story banners.

{¶28} When asked about using the term "suspended" to refer to the teacher's status, Gallek testified that many people use the terms "suspended" and "placed on leave" interchangeably, because "they're kind of synonymous in laymen's terms."

{¶29} Tiffany Patterson, a WOIO employee, testified that she authored and posted the December 14, 2011 internet article naming Sabino as the teacher under investigation. She did not know who updated the article removing Sabino's name nor did she remember when the update occurred.

{¶30} Following Sabino's presentation of the evidence and arguments by the parties, the trial court directed a verdict in favor of the defendants. As to Sabino's defamation per se claim, the trial court found the claim had not been proven because there was a need to provide extrinsic information to know that the February 20, 2012 newscast pertained to Sabino; therefore, a directed verdict was appropriate. As to the two remaining defamation claims, the trial court found:

> Well, I think one of the most painful things that I ever am called to do is grant a directed verdict motion, but I think it is truly appropriate in this case.
>
> [M]y chief concern is when I — when I look at the child porn found on the computer and I attribute that to the voice of our student — I don't mean the student testifying here today, I mean the student in that search warrant affidavit who is being quoted, then that is a fair statement.
>
> So if we interpret this as the station saying we've got a student out there who found child porn on the laptop, then [it's] a fair statement of fact.
>
> But if it's just unattributed, so I think that's the grounds that causes me to
>
> grant the directed verdict motion, that we just don't have a strictly false

statement.   That if we interpret that as being from the voice of the high school student, it's exactly what she's saying and she's quoted there in the affidavit saying it. So that will be my basis for doing it, as painful as it is.

**{¶31}** This appeal followed.

## II.   Assignments of Error

**{¶32}** Sabino raises four assignments of error for our review:[1]

I:   The trial court erred in dismissing Sabino's claims of defamation per se based upon the one year statute of limitations in defamation cases.

II:   The trial court erred in granting a directed verdict for defendants at the close of Sabino's case in chief based upon the fair report privilege.

III: The trial court erred in granting a directed verdict for defendants at the close of Sabino's case in chief based upon the innocent construction rule.

IV: The trial court erred in failing to consider the actual malice standard and in particular defendant's recklessness[,] in granting a directed verdict for defendants at the close of Sabino's case in chief.

## III.   Law and Analysis

## A.   False Light Claim

---

[1] Sabino's brief fails to comply with the appellate rules.   App.R. 12(A)(2) provides that an appellate court "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." His brief fails to argue the assignments of error separately, rendering appellate review more difficult.   If an argument exists that can support an assignment of error, it is not this court's duty to root it out. *Citta-Pietrolungo v. Pietrolungo*, 8th Dist. Cuyahoga No. 85536, 2005-Ohio-4814, ¶ 35, citing *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 2028 (May 6, 1998). Notwithstanding this deficiency and although the appellate rules were not complied with, we recognize that cases are best decided on their merits.   Appellant's counsel is admonished that, in the future, the court may disregard an assignment of error or appeal that is brought in such a manner.

**{¶33}** As an initial matter, although the trial court granted WOIO's directed verdict motion as to Sabino's false light invasion of privacy claim, on appeal, Sabino does not challenge the trial court's decision nor discuss that claim at all. Therefore, we summarily affirm the trial court's decision granting a directed verdict in favor of WOIO on Sabino's false light invasion of privacy claim.

**B. Statute of Limitations**

**{¶34}** In his first assignment of error, Sabino argues that the trial court erred by dismissing his defamation per se claim based on the one-year statute of limitations. As noted above, Count 3 of Sabino's complaint alleged a defamation per se claim premised on the initial December 2011 internet article that WOIO published. Count 4 alleged defamation per se based on the republication. The trial court did not, however, dismiss Sabino's defamation per se claims, Counts 3 and 4, based on the statute of limitations.

**{¶35}** Prior to trial, the parties agreed that Sabino would not proceed to trial on Count 3. During trial, the court stated that it was directing a verdict in favor of the defense on Count 4 of the complaint based on its determination that a viewer would have to look to information extrinsic to the February 20, 2012 broadcast to know that it was about Sabino. In doing so, the trial court merely noted that Count 3 of the complaint could not be independently based on the December 14, 2011 article, which named Sabino, because Sabino abandoned the claim by agreeing on its dismissal prior to trial, and, moreover, the claim was time-barred.

**{¶36}** Therefore, Sabino's argument that the trial court dismissed his defamation

per se claims based on the statute of limitations is misplaced.

{¶37} The first assignment of error is overruled.

## C. Directed Verdict

{¶38} In the second, third, and fourth assignments of error, Sabino argues that the trial court erred in granting a directed verdict in favor of WOIO and Gallek.

**Standard of Review**

{¶39} "A motion for a directed verdict presents a question of law, not a question of fact, 'even though in deciding such a motion it is necessary to review and consider the evidence.'" *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90, 509 N.E.2d 399 (1987), quoting *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982), paragraph one of the syllabus. In considering a motion for a directed verdict, if "there is sufficient evidence relating to an essential issue which permits reasonable minds to reach different conclusions, then it is incumbent upon the trial court to submit the issue to the factfinder for consideration." *Grau* at *id.*

{¶40} A plaintiff must establish each element of his or her defamation claim by clear and convincing evidence to avoid a directed verdict. *Barner v. Kroehle*, 8th Dist. Cuyahoga No. 87557, 2006-Ohio-5569, ¶ 14. Where, as here, the plaintiff is a private person, Ohio law requires that the plaintiff establish by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity of the allegedly defamatory statement. *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 180, 512 N.E.2d 979 (1987). "[I]t is for the court to decide as a matter of law

whether certain statements alleged to be defamatory are actionable or not." *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 78, citing *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983).

**Defamation**

{¶41} Defamation is a false publication that injures a person's reputation, exposes the person to public hatred, contempt, ridicule, shame, or disgrace, or affects the person adversely in his or her trade or business. *Barner* at ¶ 13, citing *Matalka v. Lagemann*, 21 Ohio App.3d 134, 486 N.E.2d 1220 (10th Dist.1988). The elements of a defamation action are that the defendant made a "false and defamatory statement concerning another, that the false statement was published, that the plaintiff was injured, and that the defendant acted with the required degree of fault." *Celebrezze v. Dayton Newspapers, Inc.*, 41 Ohio App.3d 343, 346-347, 535 N.E.2d 755 (2d Dist.1988). Defamation can be in the form of either slander or libel; slander generally refers to spoken words, while libel usually refers to written or printed words. *Barner* at *id.*, citing *Lawson v. AK Steel Corp.*, 121 Ohio App.3d 251, 699 N.E.2d 951 (12th Dist.1997). But defamatory matter broadcast by means of radio or television is classified as libel. *Holley v. WBNS 10TV*, 149 Ohio App.3d 22, 2002-Ohio-4315, 775 N.E.2d 579, ¶ 29 (10th Dist.), citing 3 Restatement of the Law 2d, Torts, Section 568A (1977).

{¶42} Defamation can be in the form of "defamation per se " or "defamation per quod." Defamation per se means that the defamation is accomplished by the very words

spoken or written. *Kanjuka v. Metrohealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 16 (8th Dist.), citing *McCartney v. Oblates of St. Francis De Sales*, 80 Ohio App.3d 345, 609 N.E.2d 216 (6th Dist.1992). Defamation per quod is when a statement with an apparently innocent meaning becomes defamatory through interpretation or innuendo. *Id.* citing *id.*

**Fair Reporting Privilege**

{¶43} The trial court determined that a directed verdict on Sabino's defamatory per se claim was appropriate because the February 20, 2012 broadcast did not mention him by name. The trial court also found that a directed verdict on the remaining claims was appropriate because the statement "Child Porn Found on Computer" was a fair statement of fact; it was not a "strictly false statement."

{¶44} Sabino claims that the court erred in granting the directed verdict based on the fair reporting privilege. The fair reporting privilege is codified in R.C. 2317.05, which provides, in pertinent part:

> The publication of a fair and impartial report of the return of any indictment, the issuing of any warrant, the arrest of any person accused of crime, or the filing of any affidavit, pleading, or other document in any criminal or civil cause in any court of competent jurisdiction, or of a fair and impartial report of the contents thereof, is privileged * * * .

{¶45} The trial court did not, however, base its decision solely on the fair reporting privilege. Instead, the trial court granted the directed verdict because it believed that the

defendants' alleged defamatory statement was not defamatory because the statement, "Child Porn Found on Computer," could be interpreted as a fair statement of fact when looking to the entire broadcast.

**Innocent Construction Doctrine**

{¶46} Again, the trial court determines as a matter of law whether the statements alleged to be defamatory are actionable or not; it is not a question of fact for the jury to decide. *Yeager,* 6 Ohio St.3d at 372, 453 N.E.2d 666.

{¶47} The innocent construction rule provides that if allegedly defamatory words are susceptible of two meanings, one defamatory and one innocent, the defamatory meaning should be rejected and the innocent meaning adopted. *Yeager* at *id.* On its face, "Child Porn Found on Computer," if false[2] and if shown to be about Sabino, appears to be a clear defamatory statement. But courts do not look at an allegedly defamatory statement in a vacuum. Rather, "[i]n determining whether a statement is defamatory as a matter of law, a court must review * * * the totality of the circumstances" by reading the statement in the context of the entire publication to determine whether a reasonable reader or viewer would interpret it as defamatory. *Am. Chem.*, 133 Ohio St.3d at 389, 2012-Ohio-4193, 978 N.E.2d 832, citing *Mann v. Cincinnati Enquirer*, 1st Dist. Hamilton No. C-09074, 2010-Ohio-3963, ¶ 12; *Scott v. News-Herald*, 25 Ohio St.3d 243, 253, 496 N.E.2d 699 (1986); *Mendise v. Plain Dealer Publishing Co.*, 69 Ohio App.3d 721, 726,

---

[2] Allegedly conflicting expert reports on what was found on Sabino's computer were either not attempted to be admitted or not allowed into evidence.

591 N.E.2d 789 (8th Dist.1990).

{¶48} In *Am. Chem.*, the Ohio Supreme Court stated:

The words of the publication should not be considered in isolation, but rather within the context of the entire [publication] and the thoughts that the [publication] through its structural implications and connotations is calculated to convey to the reader to whom it is addressed.

*Id.* at 390, citing *Connaughton v. Harte Hanks Communications*, *Inc.*, 842 F.2d 825, 840 (6th Cir.1988).

{¶49} This court has also concluded that when considering whether a statement is defamatory, the trial court is directed to review the statement under the totality of the circumstances. *Mendise* at 726, citing *Scott*; *see also Vogel v. Sekulich*, 9th Dist. Summit No. 16105, 1993 Ohio App. LEXIS 4603 (Sept. 15, 1993) (court must review the totality of the circumstances and evaluate the "composition and placement of the statement within the entire context of the article"). Even when considering a headline of an article, a headline must be read in context with the article following it. *See Crall v. Gannett Satellite Information Network, Inc.*, S.D.Ohio No. C-2-92-233, 1992 U.S. Dist. LEXIS 20386, *8 (Nov. 6, 1992) (When considering whether a statement is defamatory, the court must not look solely to the allegedly defamatory statements, but also consider the statements in the context of the entire article; therefore, the headline at issue must be construed along with the ensuing article).

{¶50} In *Mendise*, The Plain Dealer newspaper published an article with the headline, "Criminals Contribute to Laborers' Political Funds." The article listed several contributors to a political campaign and described their criminal backgrounds. The

plaintiff was mentioned as a contributor and the article described his involvement with a police raid, murder, and weapons charges. The article also stated he had been acquitted of all charges.

{¶51} On appeal, the plaintiff argued that the newspaper was liable for defamation because the article's headline falsely called him a criminal. This court disagreed because the body of the article was inconsistent with the meaning the plaintiff ascribed to the headline:

> The article read in its entirety expressly states that Mendise was acquitted of criminal charges. * * * Even if there were some way to argue that there was a possible defamatory interpretation of the article, the trial court still properly gave the article the nondefamatory interpretation under the innocent construction rule.

*Id.* at 726.

{¶52} We are cognizant that this case differs from *Mendise* because we are considering a television broadcast, not a newspaper article. In *West v. Media Gen. Operations, Inc.*, 120 Fed.Appx. 601 (6th Cir.2005), the federal district court also recognized that a reviewing court should analyze the defamatory nature of a publication by considering more than just the allegedly defamatory statement. A court should consider

> not only the plain text of the publication, but also the composition of the story; its syntex [sic] and context; its timing; the prominence the [publication was] accorded * * * ; the neutral, positive or negative thrust of the [publication]; material factual omissions or distortions; the image of the subject that the publication seeks to project and all other facts that may reflect upon the [defendant's] intent and purpose to publicly disseminate the information of the [publication] in controversy *   *   * [A court should be] always mindful of the caveat that the words of the publication should not be considered in isolation, but rather within the context of the entire [publication] and the thoughts that the [publication] through its structural

implications and connotations is calculated to convey to the [viewer] to whom it is addressed.

*Id.* at 617, citing *Connaughton*, 842 F.2d at 840.

{¶53} In *West*, the court found that

[i]n order to answer the question of whether the meaning reasonably conveyed by a statement made in a television broadcast is reasonably understood in a defamatory sense, the video context in which the statement is made must also be examined.

*Id.* at 616.   The *West* court found the following considerations particularly instructive:

[T]elevision programs are divided into a number of video and audio segments.   In some segments, the audio and video are of the same event such as when a person makes a remark or statement on camera.   In other segments, the audio may be a "voice-over" to a different video or photograph.   "It is the juxtaposition of these varying segments into an audio and video mosaic that conveys the meaning or meanings intended." * * * In reviewing a television broadcast for possible defamatory statements, a court and jury cannot confine their analysis to the words alone.   The court and jury are necessarily required to also consider the impact of the video portion of the program since the television medium offers the publisher the opportunity, through visual presentation, to emphasize and convey ideas in ways that cannot be ascertained from a mere reading of the words in a written transcript.

* * *

Although it is important, as in any defamation case, to focus on the words and language published by the defendant, this should not be the only focal point to the exclusion of other relevant facts and details.   The words must be viewed in their proper context in juxtaposition to all of the audio and visual components of the television broadcasts as a whole.   The defendant's defamatory words, standing alone, cannot readily be identified in isolation

without also considering the accompanying visual images, the tone of voice of the announcer or reporter, along with the combined audio and video editing effects. If words are taken completely out of the context of the audio and visual components of the television broadcasts as a whole, then it would not constitute a satisfactorily accurate, effective method for identifying televised statements and visual images which are alleged to have a combined defamatory meaning.

*Id.* at 615, quoting *West v. Media Gen. Operations, Inc.*, 250 F. Supp.2d 923, 932-934, 2002 U.S. Dist. LEXIS 26334 (E.D. Tenn., 2002).

**{¶54}** Taking our guidance from *West*, this court has viewed the broadcast and considered the allegedly defamatory banner along with the accompanying visual images and audio.

**{¶55}** Again, the broadcast piece was introduced by two news anchors sitting at the anchor desk. One anchor introduced the report as an "investigation into a high school art teacher." The other anchor said that "He is *suspected* of having child pornography on his personal computer. Only Gallek is investigating this case, and what his students *may* have seen." (Emphasis added.) Thus, just in the lead-in to the story, there are qualifiers stating that there was an investigation into an art teacher *suspected* of having child pornography, and students *may* have seen child pornography on the teacher's computer.

**{¶56}** The broadcast then cuts to reporter Gallek, who appeared sitting on a newsroom desk, holding a laptop computer. As Gallek spoke, banners appeared on the

screen, first with Gallek's name, and then with "19 Action News," "Teacher Under Fire," and "Child Porn Found on Computer." The banners appeared for approximately 43 seconds of the 72-second broadcast.

{¶57} During his broadcast, Gallek continued to use qualifiers to explain the investigation: "A couple of students borrowed a teacher's laptop. What *they say they saw * * *"*; "One *student says* she borrowed the teacher's laptop to look at pictures of the team or the class, came across a file named teen, teens having sex"; "Records show computer crime investigators took two computers"; "No charges yet, so we're not naming the teacher"; and, "I spoke with his attorney, everyone's still waiting for findings." (Emphasis added.) It is clear from the broadcast that students alleged they saw pornography on their teacher's computer, an investigation that was still ongoing, investigators took two computers, no arrests had been made, and the teacher was not currently teaching at the school.

{¶58} In considering the banners' placement and wording on the screen, it is noted that the words "Child Porn Found on Computer" appeared as part of multi-level banner and in addition to a scrolling banner or ticker. The print size of "Child Porn Found on Computer" is significantly smaller than what appears above it, "Teacher Under Fire." Other visuals shown during the 72-second broadcast included an adult typing on a keyboard, someone opening a laptop computer, documents appearing to be related to the investigation, and visuals of the school, a classroom, and flashing police lights.

{¶59} Gallek testified that the focus on television news is what people hear: "in

TV news you don't mention every single fact as you would in a newspaper article. You're writing for the ear." The alleged defamatory banner was just one of many visual elements to the broadcast; we do not find that it dominated the story to the point where it deserves significantly more weight when balanced against the rest of the broadcast.

{¶60} Sabino complains of two other elements of the broadcast: when Gallek stated that the teacher was "suspended" from school as opposed to being placed on leave and when Gallek stated that he received information from "recently filed court records" without indicating that the records were the search warrant (as opposed to an indictment). These errors, Sabino argues, coupled with the defamatory banner, add to the possibility that a reasonable viewer would find that Sabino had child pornography on his computer and, therefore, confirm the defamatory nature of the broadcast. We disagree.

{¶61} Gallek testified that many people use the terms "suspended" and "placed on leave" interchangeably and that "they're kind of synonymous in laymen's terms." He further testified that he "absolutely" did not believe that by stating in his broadcast, "No charges yet * * * He did get suspended" would lead one to conclude that Sabino was guilty.

{¶62} A "journalist need not describe legal proceedings in technically precise language." *Koniak v. Heritage Newspapers, Inc.*, 198 Mich. App. 577, 583, 499 N.W.2d 346 (1993). That Gallek did not specify in his broadcast that the "recently filed" court records consisted of the search warrant and that the teacher had been suspended as opposed to placed on leave does not indicate to this court that Gallek was intentionally

misleading the audience, nor does it lend to the "defamatory" nature of the broadcast.

**{¶63}** The trial court's interpretation of the statement at issue is supported by the innocent construction rule. The newscast could not have been reasonably understood to claim that Sabino had child pornography on his computer. The newscast could be reasonably understood to report that a Cleveland Heights art teacher was being investigated, yes, but Sabino does not dispute that he was being investigated at that time. Even if one could argue that was a possible defamatory interpretation of the newscast, the trial court could still properly give the broadcast the nondefamatory interpretation under the innocent construction rule. *See Mendise*, 69 Ohio App.3d 721 at 726, 591 N.E.2d 789.

**{¶64}** While we do not condone the sensationalistic tone of the broadcast, we hold that the challenged statement was not, as a matter of law, defamatory. Because the statement was not defamatory, we need not consider whether Sabino has met the other elements of his defamation claim.

**{¶65}** Therefore, the trial court did not err in granting a directed verdict in favor of WOIO and Gallek.

**{¶66}** The second, third, and fourth assignments of error are overruled.

**{¶67}** Judgment affirmed.

It is ordered that appellees recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga

County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR