[Cite as *Cline v. Defiance Therapeutic Massage & Wellness Ctr.*, 2018-Ohio-1891.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

ANDREA L. CLINE, ET AL.,

     APPELLEES,                      CASE NO. 4-17-19

     v.

DEFIANCE THERAPEUTIC MASSAGE
& WELLNESS CENTER, LLC,           O P I N I O N

     APPELLANT.

---

Appeal from Defiance County Common Pleas Court
Trial Court No. 16-CV-43657

**Judgment Affirmed**

Date of Decision: May 14, 2018

---

APPEARANCES:

    *Mark S. Barnes* for Appellant

    *Eric A. Baum* for Appellees

**PRESTON, J.**

{¶1} Appellant, Defiance Therapeutic Massage & Wellness Center, L.L.C. ("Defiance Therapeutic"), appeals the judgment of the Defiance County Court of Common Pleas affirming the Unemployment Compensation Review Commission's ("Commission") determination allowing claimant-appellee's, Andrea L. Cline ("Cline"), application for unemployment compensation benefits. For the reasons that follow, we affirm.

{¶2} Cline's employment as an acupuncturist with Defiance Therapeutic was terminated on September 27, 2015. (Doc. No. 1, Ex. B). After her employment was terminated, Cline filed an application for unemployment compensation benefits. (Doc. No. 4).

{¶3} On November 20, 2015, appellee, the Ohio Department of Job & Family Services ("ODJFS"), approved Cline's application for unemployment compensation benefits. (*Id.*). On December 10, 2015, Defiance Therapeutic appealed ODJFS's decision approving Cline's application for unemployment compensation benefits. (*Id.*). On January 4, 2016, ODJFS issued its redetermination affirming its November 20, 2015 determination. (*Id.*). Defiance Therapeutic appealed ODJFS's redetermination on January 25, 2016. (*Id.*).

{¶4} On January 27, 2016, Defiance Therapeutic's appeal was transferred to the Commission. (*Id.*). After telephone hearings on February 12 and March 17,

2016, the Commission issued its decision on May 2, 2016 affirming ODJFS's determination. (*Id.*). On May 23, 2016, Defiance Therapeutic requested that the Commission review its May 2, 2016 decision. (*Id.*). On June 8, 2016, the Commission denied Defiance Therapeutic's request for review. (*Id.*).

{¶5} On July 6, 2016, Defiance Therapeutic appealed to the Defiance County Court of Common Pleas the Commission's denial of its request for review of its May 2, 2016 decision affirming ODJFS's determination allowing Cline's application for unemployment compensation benefits. (*Id.*).

{¶6} Defiance Therapeutic filed the administrative file on August 18, 2016. (Doc. No. 4). Defiance Therapeutic filed its brief on October 17, 2016. (Doc. No. 10). ODJFS filed its response to Defiance Therapeutic's brief on January 18, 2017. (Doc. No. 19). On February 27, 2017, Defiance Therapeutic filed its reply to ODJFS's response. (Doc. No. 24).

{¶7} On October 25, 2017, the trial court denied Defiance Therapeutic's appeal and affirmed the May 2, 2016 decision of the Commission. (Doc. No. 25).

{¶8} Defiance Therapeutic filed its notice of appeal on November 22, 2017. (Doc. No. 26). It raises one assignment of error for our review.

**Assignment of Error**

**The Trial Court Erred in Affirming the Decision of the Review Commission that Appellee Andrea L. Cline was an Employee of Defiance Therapeutic, as Said Decision is Unlawful, Unreasonable, and Against the Manifest Weight of the Evidence.**

{¶9} In its assignment of error, Defiance Therapeutic argues that the trial court erred by affirming the Commission's decision approving Cline's application for unemployment compensation benefits because the "Commission's finding [that Cline] worked in covered employment at Defiance Therapeutic Wellness Center under R.C. 4141.01(B)(1) is unlawful, unreasonable, and against the manifest weight of the evidence." (Appellant's Brief at 21). That is, Defiance Therapeutic challenges the Commission's conclusion that Cline was not an independent contractor of Defiance Therapeutic.

{¶10} "An applicant seeking unemployment compensation benefits submits to ODJFS an application for such benefits along with information in support of his or her claim." *Henderson v. Ohio Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 12AP-154, 2012-Ohio-5382, ¶ 5, citing *McGee v. Ohio Dept. of Job & Family Servs.,* 10th Dist. Franklin No. 09AP-680, 2010-Ohio-673, ¶ 9. "Initially, ODJFS makes findings of fact and conclusions of law as to whether the applicant is entitled to unemployment compensation benefits." *Id.*, citing *McGee* at ¶ 9, citing R.C. 4141.28(B). "Such decision is subject to an appeal to the commission for a de novo hearing." *Id.*, citing *McGee* at ¶ 9, citing R.C. 4141.281(C)(1) and (3).

{¶11} "A party dissatisfied with the commission's final determination may appeal to the appropriate court of common pleas, which shall hear the appeal on the

record certified by the commission." *Id.* at ¶ 6, citing *McGee* at ¶ 10, citing R.C. 4141.282(H).

> Pursuant to R.C. 4141.282(H), "[i]f the court [of common pleas] finds that the decision of the commission was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse, vacate, or modify the decision, or remand the matter to the commission. Otherwise, the court shall affirm the decision of the commission."

*Id.*, quoting *McGee* at ¶ 10.

{¶12} "This standard of review applies to all levels of appellate review in unemployment compensation cases." *Id.* at ¶ 7, citing *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 696-97 (1995). "Applying the same standard of review at both the common pleas and appellate court levels does not result in a de novo review standard." *Id.*, citing *Tzangas* at 697. "In reviewing commission decisions, a court may not make factual findings or determine witness credibility." *Id.*, citing *Tzangas* at 696, citing *Irvine v. State Unemp. Comp. Bd. of Rev.,* 19 Ohio St.3d 15, 18 (1985). "Factual questions remain solely within the province of the commission." *Id.*, citing *Tzangas* at 697. "Similarly, a court may not substitute its judgment for that of the commission." *Id.*, citing *McCarthy v. Connectronics Corp.*, 183 Ohio App.3d 248, 2009-Ohio-3392, ¶ 16 (6th Dist.), citing *Irvine* at 18. "The fact that reasonable minds might reach different

conclusions is not a basis for reversing the commission's decision." *Id.*, citing *McGee* at ¶ 11, citing *Tzangas* at 696. "Instead, a court must 'determine whether [the Commission's] decision is supported by the evidence in the record.'" *Id.*, quoting *Tzangas* at 696, citing *Irvine* at 18. "Judgments supported by some competent, credible evidence on the essential elements of the controversy may not be reversed as being against the manifest weight of the evidence." *Id.*, citing *Houser v. Ohio Dept. of Job & Family Servs.,* 10th Dist. Franklin No. 10AP-116, 2011-Ohio-1593, ¶ 7, citing *Carter v. Univ. of Toledo,* 6th Dist. Lucas No. L-07-1260, 2008-Ohio-1958, ¶ 12, citing *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279 (1978), syllabus.

{¶13} "This court's focus is on the commission's decision, rather than on that of the common pleas court." *Id.* at ¶ 8, citing *Howard v. Electronic Classroom of Tomorrow*, 10th Dist. Franklin No. 11AP-159, 2011-Ohio-6059, ¶ 12, citing *Moore v. Comparison Mkt., Inc.*, 9th Dist. No. 23255, 2006-Ohio-6382, ¶ 8. "Thus, our task is to review the commission's decision and determine whether it is supported by evidence in the certified record and is unlawful, unreasonable or against the manifest weight of the evidence." *Id.*, citing *McGee* at ¶ 12.

{¶14} Accordingly, the issue before us is whether the Commission's determination that Cline worked in covered employment with Defiance Therapeutic is against the manifest weight of the evidence because it is not supported by some

competent, credible evidence, or, conversely, whether it is unlawful or unreasonable. *See Clark v. Ohio Dept. of Job & Family Servs.*, 2d Dist. Montgomery No. 25257, 2012-Ohio-5311, ¶ 7.

{¶15} On May 6, 2016, the Commission issued a written decision, which included the following pertinent findings of fact:

[Cline] began performing [acupuncture services for Defiance Therapeutic] with the understanding that she would be an independent contractor. [Cline] did not sign an independent contractor agreement with Carrie Radzik [("Radzik")], managing member[,] but rather agreed to pay a share of the revenue she brought in, excluding tips. [Cline] was given access to the facility and was able to set her own hours. [Cline] was responsible for providing her own liability insurance. [Cline] never discussed the prospect of performing work at another facility.

[Cline] was asked to fill-in for the receptionist to answer the telephone or schedule appointments when the receptionist was not available. [Cline] did not solely schedule appointments for herself when she filled in. [Cline] was responsible for cleaning the linens she used and was asked to clean linens used by the other individuals who provided services. [Cline] was informed as to a specific way to fold

the linens. With respect to opening and closing, [Cline] was informed of certain expectations which included opening and closing the blinds at or by certain times, turning on an outside light when leaving for the day and ensuring the back door is properly and completely shut.

During the period that [Cline] provided services she was asked to pay Worker's [sic] Compensation premiums and was encouraged to attend regular staff meetings. During the time she provided services the employer introduced a handbook which contained expectations with respect to reporting for work no later than thirty minutes prior to their first appointment, an approval process for changing schedules, a corrective access procedure, checking facility voicemail, and backroom cleaning responsibilities. The backroom responsibilities included cleaning the back area, labeling food in the refrigerator, and specific laundry instructions which included when laundry should be started, how to best dry the laundry and specific folding instructions. The manual also contains a provision for rescheduling appointments if a provider is absent and does not state that providers can bring in a substitute if they are not available.

[Cline] brought some clients to the facility when she began performing services. She was required to complete documentation

regarding the services which were placed in client charts. When [Cline] was separated she was not permitted to remove client files including information regarding the clients she brought to the facility in April, 2010.

(Doc. No. 1, Ex. B); (Doc. No. 4).

{¶16} Based on those facts, the Commission concluded that an employer-employee relationship existed between Defiance Therapeutic and Cline within the meaning of the statute. In particular, based on the application of the 20 factors under Ohio Adm.Code 4141-3-05-(B), the Commission concluded that Defiance Therapeutic "did have the right to control" Cline. (*Id.*); (*Id.*). Regarding the application of those 20 factors, the Commission reasoned:

[Defiance Therapeutic] operates a spa and the acupuncture services performed by [Cline] were essential to the profitability of the company. Those services were an integral part of the regular functions of the company. [Cline] answered the telephone and performed filing as needed. She further cleaned and folded laundry not used by her and the client's she serviced and was not permitted to take her client files when the relationship was severed. [Cline] did not have a written independent contractor agreement but rather was governed by a manual which set forth opening and closing procedures,

refrigerator cleaning, and other subjects that are not typically covered in a business to business relationship. The manual exemplifies a level of detail and control beyond what is found in a typical independent contractor agreement. In addition, [Cline] engaged in a continuing relationship, was paid regularly, was not permitted to bring substitutes and had to pay money towards Worker's [sic] Compensation coverage.

(*Id.*); (*Id.*).

{¶17} After reviewing the record, we conclude that Commission's determination that Cline worked in covered employment with Defiance Therapeutic is not unlawful, unreasonable, or against the manifest weight of the evidence. "R.C. 4141.01(B)(1) defines 'employment' as 'service performed by an individual for remuneration under any contract of hire, written or oral, express or implied, * * * unless it is shown to the satisfaction of the director that such individual has been and will continue to be free from direction or control over the performance of such service, both under a contract of service and in fact.'" *Henderson*, 2012-Ohio-5382, at ¶ 11, quoting R.C. 4141.01(B)(1).

{¶18} Consistent with the statutory definition of "employment" under R.C. 4141.01, Ohio Adm.Code 4141-3-05(A) provides, in relevant part:

"[A] worker is in employment when an 'employer-employee' relationship exists between the worker and the person for whom the individual performs services and the director determines that:

(1)   The person for whom services are performed has the right to direct or control the performance of such services; and

(2)   Remuneration is received by the worker for services performed."

*Evans v. Dir. Ohio Dept. Job & Family Servs.*, 10th Dist. Franklin No. 14AP-743, 2015-Ohio-3842, ¶ 15, quoting Ohio Adm.Code 4141-3-05(A).

{¶19} "Ohio Adm.Code 4141-3-05(B) sets forth 20 factors '[a]s an aid to determining whether there is sufficient direction or control present' to establish employment." *Id.* at ¶ 16, quoting Ohio Adm.Code 4141-3-05(B).

Those factors, which "are designed only as guides" and "must be considered in totality," include:

(1)   The worker is required to comply with the instructions of the person for whom services are being performed, regarding when, where, and how the worker is to perform the services;

(2)   The person for whom services are being performed requires particular training for the worker performing services;

(3)   The services provided are part of the regular business of the person for whom services are being performed;

(4) The person for whom services are being performed requires that services be provided by a particular worker;

(5) The person for whom services are being performed hires, supervises or pays the wages of the worker performing services;

(6) A continuing relationship exists between the person for whom services are being performed and the worker performing services that contemplates continuing or recurring work, even if not full time;

(7) The person for whom services are being performed requires set hours during which services are to be performed;

(8) The person for whom services are being performed requires the worker to devote himself or herself full time to the business of the person for whom services are being performed;

(9) The person for whom services are being performed requires that work be performed on its premises;

(10) The person for whom services are being performed requires that the worker follow the order of work set by the person for whom services are being performed;

(11) The person for whom services are being performed requires the worker to make oral or written progress reports;

(12) The person for whom services are being performed pays the worker on a regular basis such as hourly, weekly or monthly;

(13) The person for whom services are being performed pays expenses for the worker performing services;

(14) The person for whom services are being performed furnishes tools, instrumentalities, and other materials for use by the worker in performing services;

(15) There is a lack of investment by the worker in the facilities used to perform services;

(16) There is a lack of profit or loss to the worker performing services as a result of the performance of such services;

(17) The worker performing services is not performing services for a number of persons at the same time;

(18) The worker performing services does not make such services available to the general public;

(19) The person for whom services are being performed has a right to discharge the worker performing services;

(20) The worker performing services has the right to end the relationship with the person for whom services are being performed

without incurring liability pursuant to an employment contract or agreement.

*Id.*, quoting Ohio Adm.Code 4141-3-05(B).

**{¶20}** "The director shall make a determination, based on the factors listed in this rule, as to whether or not an employment relationship exists for purposes of Chapter 4141. of the Revised Code." *Hasch v. Vale*, 5th Dist. Stark No. 2001CA00361, 2002 WL 1343262, *3 (June 17, 2002). "'The burden of proving entitlement to the independent contractor exemption is on the employer.'" *BNA Constr., Ltd. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 16AP-317, 2017-Ohio-7227, ¶ 21, quoting *Peter D. Hart Research Assocs., Inc. v. Admr. Ohio Bur. of Emp. Servs.*, 10th Dist. Franklin No. 95APE06-736, 1995 WL 765202, *3 (Dec. 28, 1995), citing *McConnell v. Admr. Ohio Bur. of Emp. Servs.*, 10th Dist. Franklin No. 95APE03-262, 1995 WL 584359, *3 (Oct. 5, 1995).

**{¶21}** Cline testified at the February 12, 2016 telephone hearing. (Feb. 12, 2016 Tr. at 13). On examination by the hearing officer, she testified that she informed her existing clients that she would be performing acupuncture at Defiance Therapeutic beginning in April 2010. (*Id.* at 14). Although Cline did not sign an independent contractor agreement with Defiance Therapeutic, she "thought that we were going to be independent contractors. That we would * * * control what we

-14-

could and couldn't do * * * and that although [Radzik] would supply all my supplies * * *, that was my nature of my understanding when I began work there." (*Id.*).

**{¶22}** Cline testified that her employment with Defiance Therapeutic transformed from an independent contractor to an employer-employee relationship because "in the beginning it was assumed that * * * [Cline] would have control over [her] hours, * * * how much [she] worked[,] advertising, things of that nature and as time progressed that became less * * * an ability for" her because "[e]verything had to be approved through Ms. Radzik." (*Id.* at 19-20). More specifically,

if [Cline] wanted to do advertising it had to have [Defiance Therapeutic's] logo. It had to have all of [Defiance Therapeutic's] contact information on it * * * and we had to submit it, like if we were going to do some kind of advertising we would have to give it to [Radzik] first and she would then approve it. * * * [W]e had mandatory meetings that would take place after [Cline's] hours. [That is,] typically when [she] would be done working then we'd have a mandatory meeting that we had to attend. * * * [W]e had some mandatory events, not all, sometimes we were allowed to choose if we wanted to them [sic] but in the beginning there were a lot of mandatory outings and by those I mean like marketing opportunities. * * * [W]e had the chambers [sic] golf outing that we had to go to * *

\* and we had to wear our [Defiance Therapeutic] polos, so we had to wear [Defiance Therapeutic's] advertising while we were there \* \* \*.

(*Id.* at 20). (*See also id.* at 32-34). According to Cline, she discussed multiple times with Radzik that she was treating her as an employee as opposed to an independent contractor. (*Id.* at 34-35). Cline testified that, in response, Radzik "would get very defensive and just kind of say well this is how I run things \* \* \* and it's none of [Cline's] concern." (*Id.* at 35).

{¶23} As compensation, Cline retained 60 percent of "the profits that [she] brought in" and Defiance Therapeutic received 40 percent. (*Id.* at 15). She renegotiated her rate to 66 percent in 2013. (*Id.*). Cline received a paycheck "every two weeks" and also received compensation from tips. (*Id.* at 31). Her maternity leave was unpaid and she was required to provide notice if she intended to take vacation time. (*Id.* at 39).

{¶24} Cline paid for her own liability insurance. (*Id.* at 27-28). Defiance Therapeutic deducted workers' compensation insurance from Cline's paycheck. (*Id.* at 28). According to Cline, Radzik stated that she was paying that money toward her individual workers' compensation insurance account. (*Id.*). Cline contacted the Ohio Bureau of Workers' Compensation and was informed that "it was being paid into a \* \* \* group fund for [Defiance Therapeutic] and that there was no record of \* \* \* individuals having paid into Workers' Comp[ensation]." (*Id.*). Further, Cline

was required to purchase a Defiance Therapeutic polo shirt. (*Id.* at 20). Cline also paid for the software system used by Defiance Therapeutic. (*Id.* at 37). She testified that Radzik ordered business cards for Cline and that Cline was required to pay Radzik for them. (*Id.* at 21-22).

{¶25} When she began practicing at Defiance Therapeutic, Cline brought "an electric stem machine and heat lamp" as equipment with her. (*Id.* at 16). Defiance Therapeutic initially provided her supplies—namely, acupuncture needles; however, after she renegotiated her compensation in 2013, she provided her own supplies. (*Id.* at 17). Cline was not permitted to decorate the room in which she provided acupuncture services. (*Id.* at 31-32). She testified that she was required to wear "gray or black" scrubs and "closed toed shoes" while working at Defiance Therapeutic. (*Id.* at 20).

{¶26} In addition to performing acupuncture, Cline testified that she was responsible for laundering linens—"we had a group pile of linens in the back and then you were just in charge of washing linens * * * when you had time you were supposed to put a load in and wash them and dry them for everybody." (*Id.* at 18). Cline further testified that she was required to provide receptionist-type work, including answering the phone, scheduling and cancelling appointments for other employees of Defiance Therapeutic, answering questions, selling products, "check[ing] somebody else's patient out for them," and preparing rooms for other

employees, when a receptionist was not available. (*Id.* at 24). Cline was also required to clean the facility, including cleaning "the break room," the bathrooms and the washing machine, sweeping and mopping the rooms, and shoveling and salting sidewalks. (*Id.* at 24-25). She testified that she was required to follow procedures for opening and closing the office. (*Id.* at 30). She testified that she spent approximately eight hours each week providing these ancillary services. (*Id.* at 38). According to Cline, she assumed she would be fired for not attending the events of which her attendance was mandatory. (*Id.* at 21).

{¶27} On examination by counsel representing ODJFS, Cline testified that she received a standards of practice manual in August 2015 "that talked about opening, closing, * * * disciplinary procedures, charting * * * and then at the end [she] had to sign a paper that said [she] had * * * read through it." (*Id.* at 42-43). Cline did not receive any other document explaining her "relationship" with Defiance Therapeutic. (*Id.* at 44).

{¶28} Cline did not work for any other business while employed by Defiance Therapeutic and presumed that she would not be permitted to work for any other business. (*Id.* at 41). She testified that she was required to provide her work schedule to Radzik for approval. (*Id.* at 40).

{¶29} Cline further testified that "part of our understanding was that part of my, why the percentage was the way it was to pay for the receptionist * * *." (*Id.*

at 54). According to Cline, Radzik did not require new employees to pay for the software system even though she required Cline to pay for it. (*Id.* at 49).

**{¶30}** After Cline was terminated from her employment with Defiance Therapeutic, Cline went to the office to retrieve her belongings; however, Radzik refused to provide to Cline a list of her clientele. (*Id.* at 51-53). Cline testified that she was never provided a list of her clientele or her clients' files. (*Id.* at 53).

**{¶31}** On examination by counsel representing Defiance Therapeutic, Cline testified that she directed how she provided acupuncture services for her clients. (Mar. 17, 2016 Tr., Vol. I, at 10, 13). She identified Exhibits F and H as documents that she created instructing other Defiance Therapeutic staff members as to how to schedule acupuncture patients. (*Id.* at 14-15).

**{¶32}** According to Cline, she interpreted her employment with Defiance Therapeutic as an employer-employee relationship because she was responsible for "cleaning the whole facility or cleaning the back room, answering phones, staff meetings, and there's a practice that [employees] were supposed to be held to, mandatory charting, mandatory meetings, mandatory events, it sounds like an employee." (*Id.* at 29). However, she testified that she filed her taxes from 2009 through 2014 as a sole proprietor. (*Id.* at 34-35).

**{¶33}** Cline is the owner of Acupuncture Zen, a limited liability company that she formed in 2009. (*Id.* at 32). (*See also* Employer Ex. A). Yet, Cline was

not permitted to operate under Acupuncture Zen while she was employed with Defiance Therapeutic. (Mar. 17, 2016 Tr., Vol. I, at 33). Cline testified that she was permitted to donate her acupuncture services to charity. (*Id.* at 31). (*See also* Employer Ex. B).

{¶34} Next, Michael Goosey ("Goosey") testified that he is a supervisor in the compliance section of ODJFS. (Mar. 17, 2016 Tr., Vol. I, at 41). According to Goosey, an investigation regarding Defiance Therapeutic was initiated after Cline filed her application for unemployment compensation benefits because "no unemployment account ha[d] been established" by Defiance Therapeutic for Cline. (*Id.* at 42). In particular, ODJFS investigated whether Cline "should be deemed an employee and then covered employment." (*Id.* at 42-43). Goosey identified ODJFS Exhibits A and B as the initial unemployment compensation benefits rate determination letters regarding Defiance Therapeutic. (*Id.* at 44). (*See also* ODJFS Exs. C-O).

{¶35} Goosey identified ODJFS Exhibit P as a letter sent by Radzik's father to the Ohio State Representative that represented the district in which Defiance Therapeutic is located regarding Cline's application for unemployment compensation benefits. (Mar. 17, 2016 Tr., Vol. I, at 58-59). According to Goosey, the letter is replete with "evidence establishing [that an] employee-employer relationship" existed between Defiance Therapeutic and Cline. (*Id.* at 60-63). (*See*

ODJFS Ex. P).   In particular, Goosey testified that "when you apply the law correctly in those relationships, * * * you quickly determine that * * * there is an * * * employer-employee relationship and not a business-to-business relationship" because "the right to direct and control these * * * individuals was paramount throughout the entire relationship."  (Mar. 17, 2016 Tr., Vol. I, at 63).

{¶36} Goosey addressed whether the 20 factors under Ohio Adm.Code 4141-3-05 indicate whether an employer-employee relationship existed between Defiance Therapeutic and Cline.  (*See id.* at 64-78).   Regarding the first factor, Goosey testified that Cline, based on the instructions contained in the "independent contractor manual" was given instruction on when, where, and how to perform services.  (*Id.* at 65-70).   Indeed, Goosey testified that the manual "really should read employee manual."  (*Id.* at 70).   According to Goosey, because an individual "has been given training as an acupuncturist" or has "a license" does not mean that the person is an independent contractor.  (*Id.*).   Goosey testified that Cline could not "bring in anybody to replace her."  (*Id.* at 71).   He testified that Defiance Therapeutic hired Cline and paid Cline for her services "on a 1099 basis."  (*Id.*).   According to Goosey, even though Defiance Therapeutic did not control how Cline performed her acupuncture services, Defiance Therapeutic hired Cline "to come in and perform [her] particular services and [she was] expected to perform those services under the direction and control of the employer who knew exactly what was going on and, *

* * knew what clients were being scheduled, services received and performed by [Cline]." (*Id.* at 72-73). As to the sixth factor, Goosey testified that a continuing relationship existed between Cline and Defiance Therapeutic. (*Id.* at 73). Under the seventh factor, Goosey testified that although Cline "did not have set hours, she was able to inform her employer her hours of availability" and "if scheduled [sic] changed [sic] needed to be made, those scheduled changes had to be approved by the employer or the office manager." (*Id.* at 73). Goosey testified that, notwithstanding her attendance at outside functions, Cline primarily performed her services full-time at the Defiance Therapeutic offices. (*Id.* at 73-74). Defiance Therapeutic required Cline to generate case notes after providing a service for a client, those notes were reviewed by the office manager, and those case files "were deemed the property of the employer." (*Id.* at 74). Goosey testified that although Defiance Therapeutic paid "some of the basic overhead costs," "some of the expenses were being borne by the contractors." (*Id.* at 75). As to the fourteenth factor, Defiance Therapeutic provided a massage table and linens for all of its service providers to use. (*Id.* at 75-76). Cline paid for her licensure and insurance. (*Id.* at 75). Cline did not have any investment in the Defiance Therapeutic facility. (*Id.* at 76). Under the sixteenth factor, aside from her tax returns, Goosey could not specifically identify a profit or loss to Cline as a result of her acupuncture services. (*Id.*). Goosey testified that "there is no way to know" whether Cline was performing

the services for any other persons or entities as described by the seventeenth factor. (*Id.* at 77). He testified that "[o]ther than the * * * word of mouth," there is no way to know whether she was making her services available to the general public apart from her advertising through Defiance Therapeutic. (*Id.*). Goosey testified that, under the manual, advertising had to be approved by Defiance Therapeutic. (*Id.*). Goosey testified that Defiance Therapeutic had the right to discharge Cline and that Cline had the right to resign from her employment with Defiance Therapeutic without incurring liability "because there was no binding contractual relationship between the parties." (*Id.* at 77-78).

{¶37} On examination by counsel for Defiance Therapeutic, Goosey testified that he is not an attorney. (*Id.* at 79). He clarified that he established a conclusion regarding the relationship between Defiance Therapeutic and Cline based on those 20 factors because "as a compliance supervisor," he is required to review compliance determinations. (*Id.* at 106-107). He further clarified that he considers the requirement that employees attend staff meetings to be indicative of an employer-employee relationship because the manual indicates that there are consequences for failing to attend those meetings. (*Id.* at 90-91).

{¶38} Next, Melissa Constein ("Constein") testified that she was the office manager of Defiance Therapeutic from 2014 through 2015. (Mar. 17, 2016 Tr., Vol. II, at 7). On examination by the hearing officer, she testified that she prepared the

payroll for Defiance Therapeutic and that Cline was paid every other Friday. (*Id.* at 8). According to Constein, Cline and the other therapists were required to answer the phone and check the voicemail when Constein was not in the office. (*Id.*). Constein testified that, although the manual "was not put in place until August of 2015, there was * * * some procedures up in a gray binder [that] specifically went over how to answer the phone, how to take messages * * *." (*Id.* at 9). She further testified that the therapists were required to attend staff meetings and that there were repercussions for missing those meetings. (*Id.* at 17). Constein testified that the issue of whether Cline was an employee or independent contractor was exposed when Defiance Therapeutic "started incorporating the [new] software" system. (*Id.* at 11).

{¶39} On examination by counsel for ODJFS, Constein testified that the therapists were not permitted to have input on the manual. (*Id.* at 21). She testified that she was required to "micromanage[]" the therapists, including the time when they reported to work and whether they folded sheets correctly. (*Id.* at 24-26).

{¶40} On examination by counsel for Defiance Therapeutic, Constein testified that she was an employee of Defiance Therapeutic. (*Id.* at 31). As an employee, she did not have to pay for the software, did not pay 30 to 40 percent of her income to Defiance Therapeutic, and was issued a W2. (*Id.* at 31-32). She testified that, in her opinion, Radzik's control of the therapists exceeded the bounds

of an independent contractor relationship. (*Id.* at 38-39). As an example, Constein cited Radzik's constant pressure to sell more products—that is, although the therapist "was an independent contractor but yet she was being controlled by how much money she needed to bring into the center." (*Id.* at 39). Regarding the manual, which Constein assisted Radzik in preparing, Constein testified that Radzik "googled employee handbook, downloaded one and changed everything to independent contractor." (*Id.* at 29).

{¶41} Radzik testified on behalf of Defiance Therapeutic. (*Id.* at 60-61). On examination by the hearing officer, she testified that she initially retained 40 percent of Cline's earnings but later agreed to retain 34 percent when Cline requested "to have more supply write off." (*Id.* at 61). Although she did not pay for Cline's liability insurance, Radzik required that Cline provide "copies of [her] insurance" "just to keep in [her] file * * *." (*Id.* at 67).

{¶42} Regarding the therapists' performance of receptionist duties, Radzik testified that she "expected that they pick up the phones, but they were never told that they had to * * *." (*Id.* at 62). She testified that she did not require Cline to maintain records beyond the medical documentation required by the State. (*Id.* at 63). Regarding the linens, Radzik testified that they "were generally put into one, one basket" and that Cline "did more laundry but she was also there more, so she would have more laundry to do." (*Id.* at 65). She further testified that she required

that the linens be folded a certain way because there was limited storage space. (*Id.*).

She also required the therapists to follow certain opening and closing procedures,

including snow removal because "[i]t was their responsibility to clean [the

sidewalks] off and if it got deeper, they would just have to call the snow guy again."

(*Id.* at 66). According to Radzik, Cline did not "raise concerns * * * that she felt

she was doing employee-type duties instead of independent contractor duties."

(*Id.*).

{¶43} Radzik admitted that she edited an employee-handbook template that

she found on the internet to apply to an independent contractor. (*Id.* at 69-70).

Specifically, she testified

> that a lot of the verbiage that was in the paragraph under the employee
>
> manual, [she] would take that paragraph and understand the
>
> justification as to why that paragraph was in there, implement it if
>
> [she] felt it was necessary for an independent contractor, and [she]
>
> would re-write the entire paragraph. [She] wouldn't just take words
>
> out and delete it and enter it in.

(*Id.*). She testified that she included language in the manual regarding a

probationary period for new independent contractors because she was experiencing

a lot of turnover. (*Id.* at 70).

**{¶44}** On examination by counsel for Defiance Therapeutic, Radzik testified that she did not direct Cline as to how to perform her acupuncture services and permitted her to establish her own work schedule. (*Id.* at 73-75). She did not supervise Cline's work or review Cline's notes for accuracy. (*Id.* at 76). Although Radzik did not require approval for Cline to take time off from work, she required Cline to notify Radzik "so that [she] could look at the schedule as a whole and make sure that the rooms weren't overbooked." (*Id.* at 75). Radzik conducted staff meetings but asserted that they were not mandatory. (*Id.* at 76).

**{¶45}** She testified that the manual was meant to set forth a standards of practice and not "a list of rules and regulations." (*Id.* at 79). Radzik did not terminate anyone for failing to follow the manual. (*Id.*). According to Radzik, she "did not make anybody use the [Defiance Therapeutic] logo [for business cards] and if they wanted to go out to another company to get their own business cards, they could." (*Id.* at 81). Regarding the Defiance Therapeutic polo shirt, Radzik asserted that "some of the girls said, I want to have one of those too" after seeing Radzik wear it at an event. (*Id.*). Regarding the software system, she testified that she "brought each individual therapist into [her] office and [she] asked them how much they would want to invest in a software system [and Cline] said that [she] would pay anywhere from $100.00 a month." (*Id.* at 82). She further testified that "[t]hey were happy to do this because it was a tax write off for them * * *." (*Id.*).

-27-

{¶46} On examination by counsel for ODJFS, Radzik testified that she required all of the therapists to sign an acknowledgement form agreeing "to abide by those provisions" stated in the manual. (*Id.* at 96). Further, although Radzik testified that the staff meetings were not mandatory, she testified that the manual describes a progressive ladder of discipline for failing to attend those meetings. (*Id.* at 97-98). In addition, she agreed that the manual states that Defiance Therapeutic "has the right to terminate independent contractors who compete or interfere in any way with the sale of products or services that [Defiance Therapeutic] provides" and that the manual "references performance as salary review for independent contractors[.]" (*Id.* at 104).

{¶47} According to Radzik, after consulting the state medical board, she concluded that patient charts "are the property of the patient and the facility that they are in." (*Id.* at 100). She further testified that the manual explicitly states that "patient charts are the property of" Defiance Therapeutic. (*Id.* at 101).

{¶48} On appeal, Defiance Therapeutic advances three arguments challenging the Commission's determination. First, Defiance Therapeutic contends that the Commission's order is unlawful because it wrongly applied the statutory definition of employment in its analysis to include the ancillary services provided by Cline. Second, Defiance Therapeutic argues that the Commission's order is unlawful "[b]ecause the hearing officer failed to articulate how he applied the 20

factors to appellee's services as an acupuncturist." (Appellant's Brief at 15). Third, Defiance Therapeutic contends that the Commission's decision that Cline's work for Defiance Therapeutic constituted employment under R.C. 4141.01(B)(1) is unreasonable and against the manifest weight of the evidence based on the application of the factors under Ohio Adm.Code 4141-3-05(B).

**{¶49}** Defiance Therapeutic's first argument is meritless. R.C. 4141.01(B)(1) cannot be examined in a vacuum. *See, e.g.*, *Gress v. Gress*, 9th Dist. Wayne No. 95CA0069, 1996 WL 285373, *1 (May 29, 1996) (noting that the application of the division-of-marital-property statute cannot be examined in a vacuum, but must be considered under the totality of the circumstances); *Sabino v. WOIO, L.L.C.*, 8th Dist. Cuyahoga No. 102571, 2016-Ohio-491, ¶ 47 (noting that statements are not to be judged in a vacuum, but must be based on the totality of the circumstances). Thus, although Cline and Radzik's testimony reflects that Cline's rate of pay was based on her provision of acupuncture services, it is clear from the totality of the testimony that Cline's ability to practice acupuncture at Defiance Therapeutic and receive her rate of pay was conditioned on her performance of ancillary services. Accordingly, Defiance Therapeutic's argument that Cline's performance of her acupuncture duties should be examined separately from her performance of the ancillary services is erroneous.

**{¶50}** Also erroneous is Defiance Therapeutic's argument that the Commission's order is unlawful because "the hearing officer failed to set forth which, if any, of [the Ohio Adm.Code 4141-3-05(B) factors] compelled the Review Commission's decision." (Appellant's Brief at 14). Although the Commission's order does not explicitly state which factors the hearing officer relied on, the Commission's order generally references the Ohio Adm.Code 4141-3-05(B) factors and it is apparent from the analysis contained in the order that the hearing officer applied those factors to the testimony presented at the telephone hearings. Stated another way, it is clear that the hearing officer considered the Ohio Adm.Code 4141-3-05(B) factors because the order explicitly sets forth facts relevant to several of the factors. *See Misleh v. Badwan*, 9th Dist. Summit No. 24693, 2009-Ohio-6949, ¶ 9 (concluding that it was "clear" that the trial court considered the statutory factors "as it explicitly provided facts relevant to several of the factors"). *Compare Evans*, 2015-Ohio-3842, at ¶ 17 (discussing the facts that the trial court relied on in concluding that the 20 Ohio Adm.Code 4141-3-05(B) factors "established that Evans did not have the right to direct or control the drivers").

**{¶51}** Turning to Defiance Therapeutic's argument that the Commission's determination that Defiance Therapeutic directed and controlled Cline's work is unreasonable and against the manifest weight of the evidence, we reject Defiance Therapeutic's argument. First, based on our conclusion above, the Commission's

order is not unreasonable for analyzing the totality of the services Cline performed in rendering its ultimate conclusion.

**{¶52}** Second, there is some competent, credible evidence supporting the Commission's decision. On appeal, in challenging the weight of the evidence supporting the Commission's conclusion, Defiance Therapeutic essentially requests that this court conduct a de novo review of the Commission's application of the Ohio Adm.Code 4141-3-05(B) factors. In other words, Defiance Therapeutic contends that this court should reweigh the facts in a light more favorable to it. "[I]t is not the function of this court to reweigh the evidence." *Cassaro v. Ohio Dept. of Job & Family Servs.*, 3d Dist. Crawford No. 3-16-08, 2016-Ohio-7643, ¶ 27, citing *Hicks v. Ohio Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 13AP-902, 2014-Ohio-2735, ¶ 13. "The fact that reasonable minds might reach different conclusions is not a basis for reversing the commission's decision." *Henderson*, 2012-Ohio-5382, at ¶ 29, citing *McGee*, 2010-Ohio-673, at ¶ 11. Indeed, this court is not permitted to substitute its judgment for that of the Commission; rather, this court is required to determine whether there is some competent, credible evidence supporting the Commission's conclusion. *See Cassaro* at ¶ 27.

**{¶53}** Although no individual factor or combination of factors under Ohio Adm.Code 4141-3-05 controls, the Commission's findings supporting its conclusion that Defiance Therapeutic directed and controlled Cline are within the

province of the Commission. *Compare Hasch*, 2002 WL 1343262, at *3 ("Although no individual factor in [Ohio Adm.Code] 4141-3-05 controls, the specific findings of the Review Commission hearing officer that Vale was told to work 9AM to 5PM hours and directed where to report to work were within the province of said finder of fact."); *Henderson* at ¶ 29 ("Although no individual factor or combination of factors in R.C. 4141.01(B)(2)(k) controls, the specific findings of the commission that appellant declined Mid-Ohio's offer to be placed on the company's payroll, that Mid-Ohio did not set appellant's hours, and that appellant was free to perform outside work without penalty, were within the province of the commission."). "On close questions, '[w]here the [commission] might reasonably decide either way, the courts have no authority to upset the [commission's] decision.'" *Henderson* at ¶ 29, quoting *Irvine*, 19 Ohio St.3d at 18, citing *Charles Livingston & Sons, Inc. v. Constance*, 116 Ohio App. 437 (7th Dist.1961). Because the specific facts and circumstances of this case constitute a close question in which the commission might reasonably decide either way, we have no authority to upset the Commission's decision, and Defiance Therapeutic has not directed us to any authority permitting us to overturn the Commission's decision. *See Edan Farms, Inc. v. Toth*, 7th Dist. Mahoning No. 99-CA-185, 2000 WL 1809050, *3 (Dec. 5, 2000) ("These factors set out in Ohio Adm.Code 4141-3-05(B) are to be used by the [commission], but they are not necessarily the factors utilized by courts in

determining whether reasonable minds could find that a claimant was or was not subject to direction and control over the performance of his services.").

**{¶54}** After reviewing the record, we conclude that there is some competent, credible evidence supporting the Commission's conclusion that an employer-employee relationship existed between Defiance Therapeutic and Cline. First, the record reflects that the compliance division of ODJFS independently determined under Ohio Adm.Code 4141-3-05(B) that an employer-employee relationship existed between Defiance Therapeutic and Cline. Moreover, there was significant testimony presented at the telephone hearings regarding the manual that Cline was expected to adhere to. The record reflects the manual existed in some form throughout Cline's tenure with Defiance Therapeutic. Radzik eventually updated the manual by editing an "employee" manual template that she found on the internet. The manual directs when, where, and how duties are to be performed. The record reflects the duties beyond acupuncture that Cline was expected to perform as part of her relationship with Defiance Therapeutic, including administrative activities for other therapists working at Defiance Therapeutic; community laundry, cleaning, and snow removal; and specific opening and closing procedures.

**{¶55}** Our review of the record also reveals that Defiance Therapeutic required that acupuncture be performed only by Cline because Cline was not permitted to have any other person substitute for her during the times in which she

could not perform acupuncture services at Defiance Therapeutic. Moreover, Defiance Therapeutic required that Cline comply with the regulations imposed on acupuncturists. *Compare Miracle Home Health Care, L.L.C. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 12AP-318, 2012-Ohio-5669, ¶ 25 ("Because federal and state law mandates particular training and documentation, Miracle imposes those requirements on its home caregivers. The fact that federal and state law motivated Miracle to adopt the requirements at issue does not negate the control and direction that Miracle exercises in enforcing the requirements."). There was also testimony presented that Cline was required to receive Radzik's approval for her schedule, advertising, and outside work. *See Edan Farms*, 2000 WL 1809050, at *5 (Donofrio, J., concurring) (concluding that the determination that Toth was an employee rather than an independent contractor was supported by some competent, credible evidence because, in part, the record reflected that Edan Farms, Inc. "exercised significant control over Toth's work schedule"). Further, Cline was expected to attend regular staff meetings and hold herself out as a representative of Defiance Therapeutic.

{¶56} The record further reflects that Cline engaged in a continuing relationship with Defiance Therapeutic from 2010 through 2015. Cline received a paycheck from Defiance Therapeutic every two weeks. Group workers' compensation premiums were deducted from her paycheck. When her relationship

with Defiance Therapeutic was terminated, Cline was not permitted to obtain her clients' files or obtain a list of her clients.

{¶57} For these reasons, there is some competent, credible evidence supporting the Commission's determination that Cline worked in covered employment with Defiance Therapeutic—namely, there is some competent, credible evidence that Defiance Therapeutic exercised direction and control over Cline. As such, the Commission's decision is not against the manifest weight of the evidence.

{¶58} For the foregoing reasons, we conclude that the Commission's order is not unlawful, unreasonable, or against the manifest weight of the evidence. Therefore, the trial court did not err by affirming the Commission's decision.

{¶59} Defiance Therapeutic's assignment of error is overruled.

{¶60} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**